UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division



FILED

JUN 19 2015

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA

UNITED STATES OF AMERICA,

v.                                              Criminal No. 4:13cr116

ANTHONY LEE KING,

      Defendant.

## MEMORANDUM ORDER

This matter is before the Court on two motions to suppress filed by defendant Anthony Lee King ("Defendant"). ECF Nos. 76, 77. Beginning on May 5, 2015, this Court conducted a two-day hearing on such motions as well as two other motions, one of which the Court denied from the bench at the conclusion of the hearing, with the other subsequently denied by written order. ECF No. 133. For the reasons set forth below, both remaining motions to suppress are **DENIED**.

### I. ECF No. 76 - Las Vegas Searches

On March 29, 2012, Las Vegas Police conducted two searches pursuant to search warrants obtained that same night through telephonic application to the same state-court judge. The first was the search of a short-term "apartment" rented in the name of Daniel Owens, Defendant's alleged co-conspirator. The second search was of the hotel room in which Defendant was staying for the night.

### A. "Apartment" 317

The facts and circumstances surrounding the search of apartment 317 were discussed in detail at the two-day evidentiary hearing, and they are not repeated at great length herein.   In short, on the evening of March 29, 2012, Las Vegas Police detectives and officers, (collectively, "the Officers") were investigating a citizen-tip that a check forgery lab was being operated from apartment 317 by two individuals named "Tony and Daniel."   The Officers performed a "knock and talk" at the apartment, which was essentially one open room with the exception of the bathroom.   The apartment had been rented by Defendant's alleged co-conspirator, Daniel Owens, only five days prior to the Officers' arrival.[1]

Officers were admitted into the apartment by Benjamin Sun, an individual who informed them that while the apartment belonged to "Daniel," Sun was in fact staying there and had his personal effects there.   At no time did Mr. Sun purport to give the Officers permission to search the room, rather, he allowed them to come in so that they could speak with Daniel Owens, who was laying unresponsive on the bed, just feet from the exterior door.   From the doorway and upon entry, the Officers saw incriminating evidence in plain view, to include a laptop connected to a printer, blank "check stock," and

---

[1] Although this Court will refer to such location as an "apartment," the record suggests that it bears as many similarities to a hotel room as it does to a long-term residence, as it was rented on a week-to-week basis, and unless Owens or Defendant King paid in advance for the next week, the rental paperwork indicates that "check out time" was noon on March 31, 2012.

printed checks that appeared fraudulent. The Officers secured a search warrant based both on what they saw in plain view and on Mr. Sun's post-<u>Miranda</u> statement implicating both Daniel Owens and Defendant King in a check fraud scheme.

Defendant testified at the suppression hearing conducted by this Court that apartment 317 was rented primarily as a web design/internet marketing "business office" and that he paid a portion of the rent—purportedly making him a "co-tenant" even though his name was not on any of the rental paperwork. Defendant indicated that in addition to working at the apartment, he slept there for three nights and that Sun used such location as his Las Vegas residence.[2] It is unclear from Defendant's testimony how often Owens was at such location, although Defendant testified that Owens was <u>not</u> there when Defendant and Sun worked alongside each other for three days, purportedly doing legitimate computer/internet work.

There are two primary legal issues in dispute with respect to the search of apartment 317. First, the Government asserts that Defendant fails to demonstrate that he has a privacy interest in apartment 317. Second, Defendant asserts that Mr. Sun lacked sufficient actual or apparent authority to allow the Officers to enter the apartment.

---

[2] Additional evidence confirms Defendant's assertion that Sun had been living at apartment 317 since the day it was rented as Sun told the Officers on the night of the search that he had been living in a homeless shelter in Los Angeles until he was recruited by Defendant to travel with King and Owens to Las Vegas. Sun had purportedly been recruited to work on setting up servers and computers for a planned "crime lab."

## 1. Privacy Interest

It is well-established that "[t]he Fourth Amendment's guarantee of the people's right 'to be secure in their persons, houses, papers, and effects,' protects individuals living in a large number of legal arrangements." United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007) (quoting U.S. Const. amend. IV). As explained by the Fourth Circuit in Gray:

> Until a valid search warrant has issued, the Amendment safeguards the privacy interests of owners, boarders, and tenants, of a home, apartment, or other dwelling place. Co-tenants, co-owners, and co-occupants can also avail themselves of the Fourth Amendment's protections. And, travelers are entitled to be free from unreasonable government scrutiny in their hotel and motel rooms. Moreover, while the text of the Amendment suggests that its protections extend only to people in their houses[,] a person may have a legitimate expectation of privacy in the house of someone else.

Id. (internal quotation marks and citations omitted). Although the protections afforded by the Fourth Amendment are "broad, they are not unlimited," and "'suppression . . . can be successfully urged only by those whose rights were violated by the search itself.'" Id. (quoting Alderman v. United States, 394 U.S. 165, 171-72 (1969)). Stated differently, suppression is proper if, and only if, the individual moving for suppression himself had a recognizable privacy interest in the area that was searched, and such right was violated by the unconstitutional search. Id.

Here, although a relatively close call, the Court finds that Defendant has demonstrated a privacy interest in apartment 317. The

facts and circumstances of Defendant's and Owens' "business" and "residential" uses of the short-term rental may not be entirely clear; however, the facts are distinguishable from those in Gray where the majority concluded that the drug-dealing defendant was merely a business "invitee" on the premises that was searched. In contrast, here, the evidence demonstrates that apartment 317 was a weekly rental in which Defendant was a co-tenant with Owens from the time the apartment was rented. Because Defendant contributed to the rent and not only purportedly used such location as his Las Vegas place of business, but also apparently used it as his Las Vegas primary residence, Defendant has demonstrated that he should receive the protections of a "co-tenant."[3]

## 2. Constitutionality of Search

Although the Court finds that Defendant has a sufficient privacy interest to allege a Fourth Amendment violation with respect to apartment 317, Defendant's authority over such location was clearly shared with others, and he fails to demonstrate that Benjamin Sun

---

[3] Because four discrete suppression issues were addressed at the evidentiary hearing, the record on this issue appears somewhat less developed than if there were a single warrantless search in dispute. That said, the most reasonable interpretation of the evidence presented to the Court is that the apartment was the base of operations, both residential and business, for at least King and Sun, who appear to have been in Las Vegas for less than a week. The fact that King slept at a hotel the night before the search and the night of the search (rather than stay with two other adults in the apartment containing only one bed) therefore does not, on these unique facts, eviscerate his shared privacy interest in the apartment where he had been both living and working (legitimately, illegitimately, or both) for most of the time that he and his colleagues were in Las Vegas. Cf. Gray, 491 F.3d at 144 (indicating that privacy interests are not driven by the lawfulness of the conduct at a premises; otherwise, constitutional protections would "crumple[] on the finding of inculpatory evidence").

lacked the actual or apparent authority to admit police into such shared space.  As explained by the Supreme Court, the prohibition on warrantless entries into a home does not apply "to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises."  Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (internal citations omitted).  Whether a consenting individual possesses "common authority" over an area ultimately turns on whether he or she has joint control or joint access over such area for most purposes.  Id.; see Trulock v. Freeh, 275 F.3d 391, 403 (4th Cir. 2001) ("Authority to consent originates not from a mere property interest, but instead from 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched.'" (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1974))).

Here, Defendant would like to frame the question before the Court as whether Mr. Sun, who did not pay any rent at the apartment, had sufficient control over the premises to authorize a warrantless search.  Although Defendant's assertion that Sun lacked authority to authorize a search of the common areas of apartment 317 is dubious based on the current record, see United States v. Hylton, 349 F.3d

6

781, 785 (4th Cir. 2003) (indicating that consent to search "may be given by any one of the co-habitants of a premises, even though no other co-habitant has consented"), such framing of the issue misses the mark because Sun did not consent to a "search" of the apartment, but instead, merely invited the Officers into the common-space of the apartment in order to allow them to speak with paying tenant Daniel Owens.  See Georgia v. Randolph, 547 U.S. 103, 112 (2006) ("'[A] child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted,' but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom." (quoting 4 LaFave § 8.4(c), at 207 (4th ed. 2004))). Whether this Court categorizes apartment 317 as a Las Vegas residence for King, Owens, and Sun, or treats it as Owens' and King's "business premises" where employee Sun worked, it was patently reasonable for Sun, who appears to have slept in the apartment every night it had been rented, and who worked in the apartment a minimum of three of the five days it had been rented, to have allowed the Officers to enter the common area of the apartment where a pizza delivery person or any other business caller might well be admitted.  Such conclusion is bolstered by the fact that Owens, the listed tenant, was within a few feet of the exterior door, and the admission of the Officers

was for the purpose of allowing them to speak to the person purportedly "in charge" of the residence/business.

Defendant's motion to suppress evidence seized from apartment 317 on the basis that the Officers made an illegal warrantless entry into the apartment is therefore **DENIED**.

### B. Room 1516

The facts and circumstances surrounding the separate search of hotel room 1516 were discussed in detail at the two-day evidentiary hearing, and they are not repeated at great length herein. In short, during their investigation of apartment 317, the Officers learned from Mr. Sun that Defendant was staying at a nearby Las Vegas hotel that night. There is no dispute that Defendant had a privacy interest in his hotel room.

Shortly before 10 p.m. on March 29, 2012, Las Vegas Police Detective Rose and Officer Medeles arrived at Defendant's hotel room to conduct a "knock and talk" as part of their ongoing investigation of the check fraud scheme. A hotel security video filmed from the exterior of Defendant's room demonstrates that: (1) Defendant is escorted out of his room approximately ten seconds after he appears to open the door to the Officers; and (2) both of the Officers subsequently make warrantless entries into the hotel room. The Officers later obtained a search warrant, with the affidavit reporting that Defendant had consented to their initial entry and that numerous incriminating items were viewed in plain sight,

including fraudulent checks and bank documents in names other than Defendant King or Daniel Owens.

Proceeding directly to the determinative issues on the search of the hotel room, Defendant's testimony at the suppression hearing as to the events occurring at the hotel is afforded no weight by the Court. Notably, notwithstanding Defendant's repeated assertions under oath that it was "hard to forget" that night, Defendant's version of events materially changed throughout his briefing on this issue—perhaps prompted by the defense's discovery of the hotel surveillance video. However, far more important than Defendant's pre-hearing conduct is the fact that at the suppression hearing Defendant was unable to recall which of the two materially different versions of events he claims occurred (the first version being that Officers made an uninvited entry into his locked hotel room while he was sleeping and pulled him out of bed, the second being that Defendant opened his hotel room door after the Officers knocked).[4] Accordingly, Defendant's vague and inconsistent testimony offered no clarity as to what he contends happened that night.[5]

---

[4] Defendant testified that he was not under the influence of drugs on the night the Officers searched his hotel room, but methamphetamine was found in the open in his hotel room and he admitted to using methamphetamine in the past, to include a few days prior to the search of his hotel room. Regardless of whether Defendant's testimony was intentionally deceptive, or he was unable to recall events either because he was under the influence of drugs or because (as he claims) he was very tired and had been woken by the Officers, the fact remains that Defendant could not recall what happened, and his testimony therefore is not entitled to any weight.

[5] Defendant also failed to take the Court through the surveillance video while a portion of it was played in open Court, leaving the Court to view the silent

Although Defendant's testimony on this issue is afforded no weight, the video demonstrates that both Officers made warrantless entries into Defendant's hotel room prior to securing a search warrant. Accordingly, as to Defendant's challenge to the legality of the warrantless entries, the Government bears the burden to demonstrate that Defendant consented to such entries. See United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007) ("In responding to a defendant's motion to suppress, the Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." (citation omitted)).[6]

In all candor, based on the record evidence, the Court has had some difficulty determining what actually occurred at the hotel on March 29, 2012. As indicated above, Defendant was unable to credibly recall the events and neither Detective Rose, Officer Medeles, nor the hotel security guard who accompanied the Officers to Defendant's

and somewhat grainy video with little frame of reference.

[6] The Court agrees with defense counsel that Defendant has in essence advanced two separate challenges to the admissibility of the evidence seized from his hotel room. First, he challenges the warrantless entries into such room, with the surveillance video reflecting that both Officers entered the room prior to a warrant being secured. Second, Defendant separately challenges the veracity of the information contained in the search warrant affidavit. Because it is undisputed that warrantless entries occurred, it appears that the Government bears the burden of demonstrating the validity of the entries that preceded the warrant, whereas Defendant bears the burden of demonstrating the invalidity of the subsequent search conducted pursuant to the warrant. See Franks v. Delaware, 438 U.S. 154, 171 (1978) (indicating that because there is "a presumption of validity with respect to [an] affidavit supporting [a] search warrant," a challenger must advance "more than [a] conclusory" attack, and is required to allege a "deliberate falsehood or [a] reckless disregard for the truth" and support such allegations with "an offer of proof," before an evidentiary hearing is warranted on such matter).

10

hotel room was called as a witness at the suppression hearing.[7]  The warrant affidavit and police report that were both prepared within hours of the Officers entering Defendant's hotel room both expressly state that Defendant consented to the Officers' entry.  Although the police report is not a sworn statement, the warrant affidavit, which was based entirely on information provided by Detective Rose, was sworn to be true before a judge.

In addition to the affidavit, at a subsequent state-court probable cause hearing in Las Vegas, Detective Rose and Officer Medeles both testified, under oath, about what occurred that night. Curiously, Detective Rose never once mentioned consent in his testimony, instead indicating that he saw multiple incriminating items from the threshold of the doorway as soon as Defendant opened the door.  Although Rose's failure to discuss consent during his testimony is curious, neither the state-court prosecutor nor defense counsel asked Detective Rose specific questions regarding whether Defendant did, or did not, consent to entry, and thus, Defendant's contention that Rose "changed" his story appears to be grounded largely in speculation.

---

[7] The security guard did prepare an "incident report" that was introduced into evidence, purportedly reflecting his narrative of the relevant events on March 29, 2012. Such report, however, does not indicate whether the guard was in position to hear any of the conversation between Defendant and the Officers, nor does it in any way address the topic of whether Defendant verbally consented to the Officers entering his room. Although one could speculate that, if called to testify, the security guard could have undermined Rose's or Medeles' credibility, he also could have bolstered their testimony by confirming that he heard Defendant consent to the Officers entering the room. Accordingly, the security guard's unsworn written statement that was not tested in open court adds little to the factual calculus.

Officer Medeles also testified at the Las Vegas hearing, and he indicated that Defendant not only invited the Officers into the room, but that Defendant consented to Detective Rose looking around the room while Officer Medeles generally focused on keeping an eye on Defendant. Such sworn statements are consistent with Rose's prior sworn statements as to Defendant's consent. As indicated above, at the suppression hearing before the undersigned judge, neither the AUSA nor defense counsel called Rose or Medeles as a witness in an effort to further explore the alleged consistencies, or inconsistencies, in the Officers' prior testimony.[8]

Summarizing the evidence on the Government's side of the ledger, both Rose and Medeles have stated under oath that Defendant consented to them entering his hotel room, and that incriminating evidence was in plain sight in the hotel room.[9]   While Rose did not mention

---

[8] Comparing what the Court is able to make out in the video with Officer Medeles' testimony, there are both apparent consistencies and apparent inconsistencies. On the one hand, Officer Medeles' testimony indicates that Defendant invited the Officers into the room with him, whereas the video demonstrates that Defendant was taken out of the room by the Officers before they went in. On the other hand, Officer Medeles' testimony indicating that he primarily stayed with Defendant while Detective Rose "searched" around the room appears to be largely borne out by the video, as the officer presumed to be Rose entered the room on two occasions and appeared to illuminate his flashlight when he went in, while the other officer primarily stayed with Defendant (although he did, at one point, enter the room). The fact that Officer Medeles may have been incorrect about whether he and Defendant were standing immediately inside of the room, or just outside of the room, does not, in the Court's view, serve to undermine the credibility of Officer Medeles.

[9] Although questions may exist as to what incriminating evidence either Officer could have effectively identified from the threshold of the doorway, based on the warrant return and photographs taken of the hotel room during the execution of the search warrant, this Court has no doubt that, similar to apartment 317, incriminating checks and other financial documents were in fact laying out in the open in the hotel room.

"consent" the second time he made sworn statements about the night in question, such topic was never specifically addressed by the lawyers that were responsible for asking Rose direct questions. Moreover, Defendant did not call Rose or Medeles as a witness at the suppression hearing in an effort to undercut the reliability of their prior sworn statements, and the Court does not find that the alleged "inconsistencies" in the record highlighted by the defense are enough to call the veracity of the Officers' testimony into question.[10]   On the other side of the ledger, Defendant failed to himself present a credible conflicting version of events that can be relied on to undercut the Officers' sworn statements indicating that Defendant voluntarily consented to the Officers' warrantless entries.

Weighing the record evidence, the Court finds that the Government has narrowly carried its burden to prove consent by a preponderance of the evidence.   Specifically, the Government has introduced sworn statements from two witnesses indicating that, after voluntarily opening the hotel room door (an event that appears to be confirmed by the surveillance video), Defendant consented to Officers entering his hotel room.   Although the Court acknowledges some apparent inconsistencies in the record, the Government's burden is only by a preponderance, and Defendant has failed to himself credibly articulate a conflicting version of events.   While

---

[10]   A detective from the Las Vegas Police Department did testify at the evidentiary hearing, but he was only personally involved in events occurring at apartment 317, and his knowledge of the relevant events occurring at the hotel room was based entirely on information relayed to him by Detective Rose.

Defendant has somewhat advanced his position by highlighting inconsistencies in the Government's case, such inconsistencies are not enough to undermine the credibility of the sworn statements made by two different Las Vegas police officers that personally experienced the events in question.  Defendant's motion to suppress evidence seized from hotel room 1516 based on the Officers' initial warrantless entries is therefore **DENIED**.

The Court likewise denies Defendant's challenge to the validity of the search warrant obtained after the Officers' warrantless entries as Defendant fails to demonstrate that the probable cause determination made by a Las Vegas judge was predicated on false statements in the warrant affidavit that were either made knowingly, or made with "reckless disregard for the truth."  Franks v. Delaware, 438 U.S. 154, 171 (1978).  Because such search warrant was duly issued by a judge, it is the Defendant that bears the burden to overcome the "presumption of validity" of the affidavit supporting such search warrant.  Id.  Here, Defendant's consent to the Officers' initial warrantless entries rendered the Officers lawfully in place when they viewed incriminating evidence in plain sight. Specifically, the photographic record and warrant return demonstrate that paperwork indicative of fraud was found in "plain view," on both the table in Defendant's room and on the bed(s).  Thus, any mistakes that may appear on the face of the warrant with respect to precisely what evidence was seen in plain sight and/or precisely where in the

14

room such evidence was found does not demonstrate a reckless falsity, nor does it undercut the probable cause determination.

Moreover, even if the Court assumes that references in the affidavit to a printer (which was never found in the hotel room) and references to "I.D.s" being discovered out in the open, were not just inaccuracies made in haste, but were included in the affidavit with a reckless disregard for the truth, striking such references does not undercut the probable cause determination. See Franks, 438 U.S. at 171-72 (indicating that "when material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause," the court is not even required to conduct a Franks hearing). Notably, the hotel search warrant was a "piggyback" search made based on the earlier findings at apartment 317, it was issued by the same judge, and the affidavit in support reported other items indicative of fraud that were seen in the hotel room in plain view. Defendant's motion to suppress evidence seized from hotel room 1516 based on an allegedly defective search warrant affidavit is therefore **DENIED**.

## II. ECF No. 77 – Seizure in the Philippines

As discussed in detail on the record at the evidentiary hearing, Defendant asserts in a separately filed motion to suppress that his United States Constitutional rights were violated when United States authorities, specifically an FBI Agent, substantially participated

in the seizure of Defendant, and his personal effects, while he was in the Philippines. For the reasons discussed below, Defendant's motion to suppress is **DENIED** as he fails to demonstrate that United States authorities had a sufficient role in the foreign operations so as to render United States authorities "joint" participants in such foreign action.

It is well-established that "because the United States cannot dictate the protections provided to criminal suspects by foreign nations," the exclusionary rule does not typically apply to law enforcement activities of foreign authorities acting within their own country. United States v. Abu Ali, 528 F.3d 210, 227 (4th Cir. 2008). However, an exception to such rule applies rendering Fourth Amendment protections applicable to United States citizens while they are abroad "if U.S. agents substantially participate in an extraterritorial search of a U.S. citizen and the foreign officials were essentially acting as agents for their American counterparts or the search amounted to a joint operation between American and foreign authorities." United States v. Stokes, 726 F.3d 880, 890-91 (7th Cir. 2013) cert. denied, 134 S. Ct. 713 (2013); see Abu Ali, 528 F.3d at 229 (surveying prior cases on this issue and noting that "[a]lthough few in number, these cases do permit us to derive one general rule: mere presence at an interrogation does not constitute the 'active' or 'substantial' participation necessary for a 'joint venture,' but coordination and direction of an investigation or

16

interrogation does") (internal citations omitted)); LaFave et al.,
2 Crim. Proc. § 3.1(i) (3d ed.) ("There doubtless are a few special
situations in which it may fairly be concluded that the exclusionary
rule should apply because the circumstances indicate the American
authorities are rather directly accountable for the excesses which
have occurred" in a foreign country).

Here, the evidence presented at the suppression hearing fails
to demonstrate that United States authorities had an "active" or
"substantial" role in Defendant's seizure and detention in the
Philippines.  There is no doubt that contact from United States
authorities to Philippine authorities precipitated Defendant's
detention, arrest, and ultimate deportation from the Philippines to
the United States, but the applicable legal test requires more.
United States v. Marzano, 537 F.2d 257, 270 (7th Cir. 1976) (abrogated
on other grounds by Carter v. United States, 530 U.S. 255 (2000));
see United States v. Mundt, 508 F.2d 904, 906-07 (10th Cir. 1974).
Unlike a scenario where the United States was controlling, or jointly
managing an operation, here, after Philippine authorities were
alerted to the fact that the United States had revoked Defendant's
passport and that he was a fugitive from justice in the United States,
the Philippine authorities made the decision to arrest Defendant
based on his immigration status.  Philippine authorities also
dictated the procedures by which Defendant was arrested and detained
while his immigration status was reviewed by Philippine officials.

17

Tellingly, after United States authorities contacted Philippine authorities regarding Defendant's immigration status, the Philippine official temporarily responsible for deciding whether to issue a Philippine "Mission Order" authorizing Defendant's arrest was unwilling to take such action until after he had the opportunity to speak with his superior who was out of town on that day. The fact that a Philippine official would not act at the request of the United States FBI but instead wanted approval from his Philippine superior further demonstrates which sovereign was responsible for Defendant's arrest.

The Court likewise finds that the operation was not rendered "joint" because one United States FBI agent was present in the Philippines to identify Defendant at the time of his arrest by a large team of more than ten Philippine officers. Similarly, the fact that the same FBI agent later traveled with Defendant on a plane from the Philippines to Los Angeles in order to facilitate Defendant's transfer of custody from Philippine authorities to United States authorities approximately forty days after Defendant's initial arrest is plainly insufficient to render the operation "joint."[11] Notably, Defendant was never questioned or searched by United States authorities while in the Philippines and his seized possessions that are the subject of the suppression motion, including cell phones and

---

[11] The record, and common sense, suggests that United States authorities would have preferred that Defendant's deportation to the United States occur faster than it did, but U.S. authorities waited for the Philippines' own sovereign process to play out.

other electronics, would <u>likewise have been constitutionally seized in the United States</u> incident to his arrest.  For these reasons, Defendant's motion to suppress the seizure of his personal effects that were first seized in the Philippines by foreign authorities, and later turned over to the United States in conjunction with his deportation pursuant to Philippine law, is **DENIED**.[12]

### III. Conclusion

For the reasons stated above, Defendant's two outstanding motions to suppress are **DENIED**.  ECF Nos. 76, 77.

The Clerk is **REQUESTED** to deliver a copy of this Memorandum Order to counsel of record for the United States and for Defendant.

It is so **ORDERED**.

/s/ [signature]
_____
Mark S. Davis
United States District Judge

Norfolk, Virginia
June 19 , 2015

---

[12] Even if Defendant had demonstrated that he was seized as part of a joint operation, it does not appear that he has proven a violation of his United States Constitutional rights.  Defendant had been federally indicted in the United States prior to his arrest in the Philippines, and thus, he does not appear to have had a right to "prompt presentment" as claimed in his motion.  <u>Abu Ali</u>, 528 F.3d at 227 n.4.  Moreover, Defendant fails to demonstrate that the warrant requirement applies extra-territorially, <u>Stokes</u>, 726 F.3d at 892-93; <u>In re Terrorist Bombings of U.S. Embassies in E. Africa</u>, 552 F.3d 157, 171 (2d Cir. 2008), and he likewise fails to demonstrate that the seizure and retention of his personal effects was a violation of the Fourth Amendment's "basic requirement of reasonableness," which requires balancing "the intrusion on individual privacy against the government's need for information and evidence," <u>Stokes</u>, 726 F.3d at 893 (citation omitted).